FRANK FIELDS v. THE STATE.

No. 1040. Decided March 22, 1911.

Rehearing Denied April 27, 1911.

**Burglary—Sufficiency of the Evidence.**

See opinion for facts held to be sufficient to support a conviction of burglary.

Appeal from the District Court of Fannin. Tried below before the Hon. Ben H. Denton.

Appeal from a conviction of burglary; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Taylor & Lipscomb,* for appellant.—On the question of the insufficiency of the evidence: Bowen v. State, 133 S. W. Rep., 256; Rushing v. State, 80 S. W. Rep., 527; West v. State, 21 Texas Crim. Rep., 427, 2 S. W. Rep., 810; Irvin v. State, 18 Texas Crim. App., 51; Banks v. State, 56 Texas Crim. Rep., 262, 119 S. W. Rep., 847; Combs v. State, 52 Texas Crim. Rep., 613, 108 S. W. Rep., 649; Pratt v. State, 59 Texas Crim. Rep., 167, 129 S. W. Rep., 364, 60 Texas Crim. Rep., 515; Daniel v. State, 132 S. W. Rep., 773.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of burg-

lary, his punishment being assessed at two years confinement in the penitentiary.

There are some exceptions to the charge which we think are without merit. The charge as a whole sufficiently and clearly submits the issues, and correctly.

The most serious question is the contention of appellant that the evidence is not sufficient. The indictment charges appellant with burglarizing a house belonging to Arledge. This occurred about the 19th of August, 1909. Just across the street from the store was a meeting in progress. Near the corner of the store, and something like four feet back from a straight line of the north wall of the store-house, was a well, with a small ice house intervening between the store and the well so that a man standing at the well could not see a party at the point of entrance, which was a window in the north wall of the house. There was a gallery in front on the north end of the house. A witness testified that he came from the place where the meeting was in progress to the well; that appellant was about the gallery of the store at the time, and joined him at the well. Appellant drew a bucket of water, emptied the water into another bucket, and in company with witness, who had a baby in his arm, returned to the tent, carrying the water for the witness. Later another witness testified that he went to this same well and saw a party on the gallery; that he was between the window and a box which was setting against the window; that the box was on the outside of the window and set against it. This was moved so as to make it set, as the witness expressed it, "antigodlin." What "antigodlin" means is not shown by the witness, but we suppose he meant that it was set diagonally to the window after being moved so as to permit the party to pass between the side of the box and the window. This is as near as we can judge of the meaning of the term "antigodlin." We fail to find that term defined anywhere, and if the above ascribed meaning is not correct, then we are at a loss to know what the witness meant by "antigodlin." The window sash was raised and had no blinds attached; across the window were some iron bars several inches apart which were screwed to the wall or window frame on the inside of the building. Two of these had been unscrewed at one end so as to permit the party to make the entry. About twenty dollars in money had been taken from the cash drawer—ten dollars consisted of two five-dollar bills, the remainder being in silver of different sizes or denominations. Appellant had clerked in the store for a prior owner, but had not clerked for the alleged owner. He had also worked for a man named Ogerly, and quit Ogerly's employment about the 21st of July. He then made a contract with Arledge, the owner of the store, to begin work for him at his gin as soon as it began operation. In the meantime he seems to have been an inmate of Arledge's home and about the place waiting for the ginning season to open. When appellant came to the home of Arledge he had some money. Before the burglary appellant was in the city of Bonham,

and on returning informed Arledge there was freight for him at the depot which he would have brought but did not have the money to pay the charges, as he was "all in"—that is, that he was out of money. This was prior to the night of the burglary. Subsequent to the burglary appellant made some purchases in Bonham as evidenced by his testimony before the grand jury, amounting in all to about $12.50. It is unnecessary to state the items. He accounted for this money by stating that after the burglary he had been paid by Mr. Ogerly the sum of fifteen dollars, a ten-dollar bill and five dollars in silver. Ogerly testified that he had not paid appellant any money after the 21st of July, at which time he had paid him a twenty-dollar bill. Appellant owned a horse and buggy, which he left in Bonham after being before the grand jury, and took the train to Paris. It is shown that he had previously lived there or had been raised there, and was on a visit to some relatives. This was introduced by the State as tending to show flight. Without going into further details of the circumstances, this is about the strength of the State's case. The witness Reed, however, testified that he saw a man standing between the box and the window, and that he had his hand up, but just in what way the witness was not definite. This witness also testified that he had known appellant for a couple of years, and knew him well, and that the man he saw at the window suited the description of appellant all right, and that was about all he could tell about it, but in his best judgment it was appellant. Taking these facts altogether, we do not feel authorized to disturb the finding of the jury. While the evidence is not as clear as we might wish, yet we are of opinion that the jury were justified in reaching the conclusion they did. The judgment is affirmed.

*Affirmed.*

[Rehearing denied April 27, 1911.—Reporter.]